NO. 07-06-0422-CR

NO. 07-06-0423-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

FEBRUARY 14, 2008

_____

LINDA LITTLE AND WALTER LITTLE, APPELLANTS

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE COUNTY COURT AT LAW NO. 1  OF POTTER COUNTY;

NOS. 114832 & 114834; HONORABLE W.F. "CORKY" ROBERTS, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**OPINION**

Following a consolidated bench trial, Appellants, Linda Little and Walter Little, were convicted of enticing a child, a Class B misdemeanor, and sentenced to 90 days

confinement, suspended in favor of one year community supervision.[1] Appellants contend the trial court erred in its determinations that: (1) the evidence in support of their convictions was legally sufficient; (2) the evidence in support of their convictions was factually sufficient; and (3) the testimony of their character witness, Nicole Gonzales, was properly excluded at trial. We affirm.

## **Background**

In the Fall of 2005, Abigail Medina was sixteen years old and living with her mother, Matilde Medina. Abigail began dating Steven Little, whose parents are the Appellants herein.[2] Although Matilde initially approved of their dating relationship, she began to have doubts when Appellants invited Abigail to their house to watch prophetic videos and receive religious instruction; informed her the dating relationship would be no contact–no hand-holding or kissing; requested that Matilde give them a set schedule of when Abigail would be in their home; and offered to pay one-half of the expense of an internet subscription for the Medinas. When Walter offered to pay one-half of their internet subscription, Matilde informed him that her computer was not working. Afterwards, she arrived at home to find him repairing her computer and learned that, at least for a portion

---

[1]We combine these two appeals in a single opinion. The facts underlying both convictions arise from the same criminal episode. Both parties are represented by the same attorney on appeal and their briefs and issues stated therein are the same.

[2]Walter was Steven's natural father and Linda was Steven's stepmother.

2

of the time he was there, he had been alone with her two daughters. Matilde refused to give Appellants a fixed schedule and turned down Walter's internet offer.

While Steven and Abigail were dating, Matilde allowed Abigail to attend Steven's Seventh Day Adventist Church on Saturdays and her regular church, a small Spanish Assembly of God Church, on Sundays. Abigail enjoyed going to Appellants' house because they did a lot of fun things such as watching movies and playing games. There were problems at her home,[3] and she preferred spending time with Appellants.

After associating with Appellants, however, Abigail's attitude and behavior toward her family changed. She would not eat with her family on Sabbath Days, Friday and Saturday nights, complaining the food was bought from a store or restaurant. She also quit speaking with her mother's live-in fiancé, Carlos Olivas, because she now believed he was a sinner and could not be trusted. She also would not speak to her mother or allow her to hug her or let her close. Abigail stated that Appellants' religion was now her religion, and Walter was her "daddy." When confronted about not following her mother's wishes, Abigail told Matilde that she was no longer under her authority.

On December 12, Matilde gave Abigail permission to have dinner at Appellants' house. Matilde became worried when Abigail was hours late returning and called Appellants. Linda told Matilde that her husband had left an hour earlier to bring Abigail

---

[3]Matilde was grieving the loss of her father and devoting a substantial amount of time to raising Abigail's younger sister who required more attention than Abigail.

home. In fact, he and Abigail were sitting alone in his parked car down the block from the Medina's house for more than forty-five minutes. Her daughter indicated Walter had been giving her advice about Steven.

On December 16, Matilde allowed Abigail to visit Appellants and see Steven off at the airport. After Steven left, Appellants asked Matilde if Abigail could spend the night. Matilde declined the invitation. On December 20, Matilde permitted Abigail to have dinner with Appellants at their home. When she called home from work at 8:00 p.m., her younger daughter told her Abigail was not at home and that Abigail had spoken with Walter on the phone two days earlier for five hours. Matilde immediately called Walter and told him enough was enough. Matilde told him to bring her daughter home and never to speak with her again. When Matilde returned home two hours later, Abigail had not returned. When Matilde called Appellants on their home and cell phones, there was no response. Matilde sent Carlos to Appellants' house to pick up Abigail. When he arrived, Walter told Carlos that his wife had left with Abigail to take her home. At that point, Matilde informed Abigail that she could not see Steven or Appellants anymore. Unbeknownst to Matilde during this period, Appellants were talking to Abigail about moving in with them.

Following this confrontation, Abigail began receiving letters and gifts from Appellants at her home. Matilde also received a three page, single-spaced typewritten letter from Walter generally denigrating Matilde and stating "[t]he only reason you don't have a major rebellion on your hands already with Abby is because of my teaching her on submission

4

to Godly authority." Walter's letter made no mention of Appellants' desire that Abigail come live with them.

Abigail also began sneaking out of her house to attend church with Appellants. When Matilde confronted Abigail, Abigail indicated Matilde was no longer her authority; Walter was her father, and she wanted to live with Appellants. Matilde again asked Abigail to sever her relationship with Appellants and Steven.

During this same period, Abigail began telling Matilde that their house was filled with sin. Walter had instructed Abigail to be spiritually prepared for all the demons living in their house because Matilde and Carlos were living out of wedlock. Abigail told Matilde she didn't belong in her home any longer because she had to fight demons every day and she belonged with her daddy, Walter. Abigail cried daily and spent a lot of time in her closet during the daytime. At times, Matilde found Abigail in her closet with her Bible where she twice slept overnight. Abigail also believed certain objects including her teddy bears were possessed by demons. The only place Abigail could find comfort was in her closet with her Bible. She told Matilde that her home was Walter's home, and she wanted to live there.

Before Christmas, Walter prepared a form for Matilde's signature giving Abigail permission to live with Appellants. The document was drafted by Walter and delivered by Steven to Abigail at school. Appellants told Abigail to show the document to her mother

5

and see if she would sign it.[4]  After Christmas, Walter purchased a cassette tape recorder for Abigail.  He would tape messages on a cassette tape and have the tape delivered to Abigail through Steven at school.  Abigail would listen to the message, tape her response on the same cassette, and swap the tape back and forth.

On December 31 and January 16, Matilde discovered her daughter speaking with Walter on their phone.  After each incident, Matilde called the police and the police then spoke with Walter.  On January 20, Sergeant Brush of the Amarillo Police Department came to her home and received permission to have Abigail tested to see whether she had been sexually assaulted.  The test was negative.

On January 21, Abigail attended the ROTC Ball at her high school.  Matilde later learned that Appellants sat with Abigail during the dinner.  Matilde reported the incident to the police and enlisted the assistance of a ROTC official, a math teacher, Abigail's high school principal, the school's liaison officer, and school counselors to protect her child from Appellants.

A letter dated January 30 from Linda to Abigail stated:

> You have become a part of this family. . . .  I have long prayed for a daughter that would hunger and thirst for God.  In you, those prayers have been answered. . . .  I also wait for the day you come home to us. . . .  We look forward to sharing simple things in life with you . . . cooking, playing games

---

[4]Appellants never discussed the document, or Abigail coming to live with them, with Matilde.  Abigail never showed her mother the document.

6

(Boogle anyone?), watching movies, going to a park on a picnic, walking in the park, playing some basketball, and most importantly sharing truth that God wants you to know and have in your treasury. . . . Soon Abby you will be with us. I see it in my minds eye.

Abigail began begging her mother to allow her to leave and live with Appellants. She told Matilde that God wanted her to live with Appellants; Appellants were her family; Matilde was not her authority–not her mother; and God would make it happen. She further indicated that Walter was her real father and her family was not her God-given family, Appellants were.

Matilde hired sitters to stay with her daughter while she was at work to keep her daughter away from the telephone and assure Appellants did not contact her. On February 2, a sitter observed Appellants approaching Abigail at a choir concert and giving her hugs. When Matilde confronted her daughter, Abigail told her that God had told Walter she belonged to him. Abigail also told her mother that Walter had said: "He is my father and in two weeks you're going to take me to—and give me away to him. God has spoken. It will happen, so I'm not worried about it anymore."

On February 18, nearly two weeks later, Abigail decided to run away from home. She called Walter, told him her plans, and asked if he would pick her up the next morning at 2:00 a.m. Walter agreed and told her to call him when she was ready. The following morning at 2:00 a.m., Appellants were waiting for Abigail in their car across the street from the Medina house. Abigail left a note for her mother to find. Over the next nineteen hour

period that Abigail was with Appellants, they went to breakfast, lunch, a movie, and to a church.[5] They did not go to Appellants' home because they were afraid they would be discovered there. During the course of the day, Abigail changed her mind about running away, and told Appellants she wanted to return home. In the evening, Abigail testified they went to a church to "talk without anybody bothering us or any worries about anybody finding us." They talked about her living with them and going back home. At 9:00 p.m. the police were called and they returned Abigail to her mother at 11:00 p.m., after which Abigail met with her pastor.

The next morning Abigail told her mother she had been with Appellants and apologized for leaving. Abigail told her it was preplanned and she had been instructed to write the runaway note. Soon thereafter, Matilde discovered an undated card from Walter to Abigail which stated:

> Missing you Abby. Distance never separates hearts that really care. Though we may not spend as much time together as we'd like . . . You're always in my thoughts because you're always in my heart. I love and miss you very much, mi jita! Love always, Dad. (See back).

---

[5]When Matilde initially discovered Abigail was not at home, she thought Abigail had gone to her church with Matilde's sister. However, when she discovered Abigail was not returning from church, she called the police and reported Abigail missing. Although she called Appellants' home and cell phones, she never received an answer. Matilde accompanied the police to Appellants' house but no one was at home. The police brought Abigail home around 11:00 p.m. that night. At no time during the nineteen hour period did Appellants attempt to contact Matilde. Steven was not with them.

To my adorable daughter, Just a quick note to go along w/this token of my love for you. I will be praying for you today for strength to carry on and encouragement as God's hand moves to bring you home. I'll also be fasting all day Wed for you–remember I'm on vacation this week. Some quick highlights: (1) Remember your mother saying we could not "afford you" . . . So as you can see, God is taking care of that as well. You will be WELL taken care of. . . . (3) We now have Caller I.D. and call forward on the line so if you call our toll free # and we're not at home, it'll forward to my cell phone. I need a big hug from my loving daughter! I love you so very much, Abby! You are truely my precious daughter. Love you always, Dad. P.S. How was your talk w/Steven? I'll tell you what God told me to do when we talk again. Steven has free will like the rest of us, so it's still his decision to follow God or not.

Matilde then hired an attorney to keep Appellants away from her daughter. In a letter to Appellants dated March 7, her attorney directed them to cease all contact with Abigail, or legal action would be taken.

On March 10, during Spring Break, Matilde searched her daughter's room and found personal letters, cards, and notes to her daughter from Appellants. After Matilde's mother had prohibited Abigail from communicating with Appellants in December 2005, Walter developed a number of ways of communicating with Abigail. Steven would give Abigail letters and candy from Appellants at school. She and Walter would communicate by giving messages to her friend, Marshall, also at school. Walter also arranged for them to speak through voice-mail. Abigail would dial a toll-free number, give her password and either receive messages or leave messages for Walter and so forth.

Walter also had an agreement with Abigail that she would meet and talk with him each morning when he dropped Steven off at school.[6]  In fact, after Appellants were arrested, Walter continued to meet with Abigail in this fashion even though it was a violation of his appearance bond.

After Appellants were arrested, Walter drafted a document dated April 13, 2006, entitled "My Statement" and instructed Abigail to sign and notarize the document.  He also instructed Abigail to re-type the document so that it would appear that Abigail had written it.  When Abigail completed her re-drafting, the document was ninety percent Walter's language and ten percent her own.  Walter also told Abigail that the document was intended to be used in court to obtain custody of Abigail.  Abigail last spoke with Appellants near the end of April or early May 2006.  Walter told Abigail that he had thrown away all the letters she had sent him and their tapes.

Abigail testified that she continued to see Appellants after her mother forbade her to do so because she wanted to see them.  She testified Appellants called her "daughter," and she called them "mom" and "dad."  She indicated Appellants were very supportive of her and expressed a lot of love for her.  She testified Appellants encouraged her to leave her home and live with them.  Walter also testified that Appellants encouraged Abigail to live with them and that Abigail wanted to live with them.

---

[6]Steven was not present during these conversations.

Abigail testified as follows:

At one point I did not want to keep—I did not want to keep disobeying my mother and lying and doing all the secretive things that I was doing—but they encouraged me and I just kept going. I said, okay. I'll do just one more lie. I'll disobey my mom one other time. That–I did not tell them that though.

On April 5, 2006, Appellants were charged with enticing, persuading, or taking Abigail from the custody of her mother without her mother's consent.

## State's Failure to File Appellate Brief

Appellants' briefs were filed April 18, 2007.[7] The State's brief was due on or before May 18, 2007. Tex. R. App. P. 38.6(b). The State did not file a brief nor request additional time in which to do so. Rule 38.8(b) of the Texas Rules of Appellate Procedure expressly guides this Court as to what to do if an appellant fails to file a brief; however, there is no corresponding rule to guide us when the State fails to file a brief in response to an appellant's brief. Several intermediate appellate courts, including this Court, have held that whenever the State fails to file a brief, an appellate court should conduct an independent analysis of the merits of the appellant's claim of error, limited to the arguments raised at trial by the State, to determine if there was error. *See Siverand v. State*, 89 S.W.3d 216, 220 (Tex.App.–Corpus Christi 2002, no pet.); *Haley v. State,* No. 13-02-0033-CR, 2006 WL 3374971 (Tex.App.–Corpus Christi Nov. 22, 2006, pet. ref'd) (not designated for

---

[7]Appellants' briefs were due on April 17, 2007; however, Appellants' *Motions to Extend Time* were granted, and the briefs were timely filed.

11

publication); *Mosley v. State*, Nos. 07-02-0178-CR, 07-02-0179-CR, 2003 WL 21919261 (Tex.App.–Amarillo Aug. 12, 2003, pet. ref'd) (not designated for publication); *cf. In re Bowman*, No. 03-07-0418-CR, 2007 WL 4269842 (Tex.App.–Austin Dec. 5, 2007, no pet.) (not designated for publication); *Burns v. Rochon*, 190 S.W.3d 263 (Tex.App.–Houston [1st Dist.] 2006, no pet.). The decision to independently review the merits of Appellants' issues should not be construed as approval of the State's dereliction of its responsibility to file a brief. The State's failure to file a brief, in this or any other action, makes the job of this Court considerably more time consuming and difficult.

## Discussion

Appellants raise the following three issues: (1) the evidence was legally insufficient because Abigail testified that Appellants did not persuade her to leave her home, *i.e.,* she left voluntarily; (2) the evidence is factually insufficient to show that caring for a runaway child for nineteen hours is not a sufficient amount of time to constitute an interference with the child's custody; and (3) the testimony of their character witness, Nicole Gonzales, was improperly excluded by the trial court as irrelevant.

### I.    First Issue – Legal Sufficiency of the Evidence

When conducting a review of the legal sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the

12

offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *McKinney v. State*, 207 S.W.3d 366, 374 (Tex.Crim.App. 2006); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex.Crim.App. 2005). For purposes of appellate review of the legal sufficiency of the evidence to support a conviction, this Court must give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this is the function of the trier of fact. *See Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Instead, we determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the adjudication. *Adelman v.* State, 828 S.W.2d 418, 422 (Tex.Crim.App. 1992).

A person commits the offense of enticing a child if, with the intent to interfere with the lawful custody of a child younger than eighteen years, he knowingly entices, persuades, or takes the child from the custody of a parent or guardian. Tex. Penal Code Ann. § 25.04(a) (Vernon 2003).[8] Enticement of a child is a crime against the parents rather than the child because the parent loses the privilege of society and custody, care, control, and services of the child. 19 Tex. Jur. 3d *Criminal Law* § 526 (2000). To "entice"

---

[8]Appellants do not dispute Matilde is Abigail's mother entitled to legal custody of her child or, at the time of the offense, Abigail was under eighteen years of age.

means to "draw on; to instigate by inciting hope or desire; to allure, especially in a bad sense; to lead astray; to tempt; to incite." *Escobar v. State,* 138 Tex.Crim. 71, 133 S.W.2d 781, 783-84 (1939).

That Abigail may have left home voluntarily is no defense to the offense of enticing a child. *See Sanchez v. State,* 712 S.W.2d 170, 171 (Tex.App.–Austin 1986, no pet.) ("Under this statute, the consent of the minor is irrelevant and it is of no legal effect that her actions in leaving are in fact voluntary."); *Truelove v. State,* 96 Tex.Crim. 537, 258 S.W. 826, 827 (1924). Refusing to recognize a defendant's asserted defense that the minor left home voluntarily, the Texas Court of Criminal Appeals stated:

> [w]e are not impressed with the soundness of such doctrine. In this instance the person offended against is not the minor but the parent of the minor who thus loses the privilege of the society and the custody, care, control and services of such minor. It is the parent's duty, and should be his pleasure, to train and care for the child, and attempt to bring it up in such a manner that it may become a useful member of society. This is a valuable right, and by proper thinking parents treasured most highly. That such a right can be wished away at will by a wayward child is not based upon sound reason, and, in our judgment, the voluntary leaving home with another,–who might have held out enticing and alluring ideas and promises to such child,–should not be a proper defense to a charge such as this.

*Escobar,* 133 S.W.2d at 782-83.

Appellants rely upon *Cockrell v. State,* 71 Tex.Crim. 543, 160 S.W. 343 (1913) for the proposition that it is the child's state of mind that determines if the child was enticed to run away. *Cockrell* is of no assistance to Appellants. The facts of *Cockrell* are markedly

14

different from this case. In *Cockrell*, the accused was a nineteen year old girl and the child allegedly enticed was her eighteen year old cousin. The child had been severely disciplined by her father, and the accused told her that she would leave home before she would stand such treatment. Subsequently, the child left her house and traveled, in part with the accused, to Oklahoma to escape from her enraged father, who had been searching for her with a gun. The court determined that no one enticed the child to leave her home. Rather, she was forced to abandon her home because of extreme measures taken by her father. That the accused expressed her sentiments and accompanied the child on her flight from her father did not amount to enticement. *Id.* at 345. The *Cockrell* court stated, "it must be shown the minor left the home of its parents at the instance, suggestion, and by the persuasion of the person accused." *Id.*

Here, the record is replete with evidence that, prior to Abigail leaving her mother's home, Appellants not only suggested, but encouraged, persuaded, and enticed Abigail to leave the Medina home in a variety of ways. Appellants criticized her mother's lifestyle from a moral and religious perspective while encouraging Abigail to leave her family and come live with them. They estranged Abigail from her home and family by teaching her that her mother and live-in fiancé were living in sin and that demons possessed her house. They played upon Abigail's religious convictions by telling her Walter was her God-given father; they were her God-given family; and God preordained that she should come live with them. Walter encouraged Abigail to disobey and lie to her mother in order to conduct clandestine communications contrary to her mother's wishes. He bought her a tape

15

recorder to swap messages; sent her letters and candy through his son; established a telephone voice mail account for them to swap messages; and pre-arranged secret meetings each school day when he dropped his son off at school. Even after his arrest, he continued this behavior. Appellants also gave Abigail gifts and assured her she would be well taken care of if she came to live with them. And, when Abigail agreed to run away from her mother's home, Appellants immediately decided to, and did, supply the manner, means, and opportunity for her to leave her home and remain secreted from her mother for a period of nineteen hours. Unlike the accused in *Cockrell* who merely expressed her sentiments and accompanied the runaway for part of her journey, 160 S.W. at 345, Appellants did much, much more.

We find, based upon the record, the State's evidence was legally sufficient to satisfy all elements for proving the offense of enticing a child. Appellants' first issue is overruled.

## II.  Second Issue – Factual Sufficiency of the Evidence

When conducting a factual sufficiency review, we examine all the evidence in a neutral light and determine whether the trier of fact was rationally justified in finding guilt beyond a reasonable doubt. *Roberts v. State,* 220 S.W.3d 521, 524 (Tex.Crim.App.), *cert. denied,* 128 S.Ct. 282, 76 U.S.L.W. 3165 (2007); *Watson v. State*, 204 S.W. 3d 404, 415 (Tex.Crim.App. 2006). We are to give deference to the factfinder's determination if supported by the record, and cannot reverse a conviction unless we find some objective basis in the record that demonstrates that the great weight and preponderance of the

16

evidence contradicts the verdict. *Id. at 417.* The criminal verdict will be set aside "only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence so strong that the standard of proof beyond a reasonable doubt could not have been met." *Garza v. State,* 213 S.W.3d 338, 343 (Tex.Crim.App. 2007). In addition, we must include a discussion of the most important evidence that the appellant claims undermines the verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Appellants contend that, because Abigail was gone from home no longer than nineteen hours, Appellants did not interfere with, or take Abigail from, the "custody" of her mother. The Texas Penal Code does not define the term "custody." Thus, we must construe the language in context according to the rules of grammar and usage; Tex. Gov't Code Ann. § 311.011(a) (Vernon 2005); *Dowthitt v. State*, 931 S.W.2d 244, 258 (Tex.Crim.App. 1996), while keeping in mind that words undefined by statute that have not acquired a technical meaning should be given their ordinary meaning. *Garcia v. State*, 887 S.W.2d 846, 859 (Tex.Crim.App. 1994). The term "custody" appears twice in the Texas Penal Code. § 25.04(a). The first reference is to the "lawful *custody* of a child," and the second reference is to the "*custody* of the parent or guardian or person standing in the stead of the parent or guardian of such child." *Id.* (emphasis added).

In *Cunyus v. State*, 727 S.W.2d 561 (Tex.Crim.App. 1987), the Court considered the family law concept of custody in its determination of whether the defendant intended to interfere with the custody of the childrens' parents. *Id.* at 564. In making its

17

determination, the *Cunyus* Court found it unnecessary to consult the Texas Family Code

which establishes the principle of custody of a child through a detailed, statutory scheme

in lieu of the Texas Supreme Court's pronouncement in *Leithold v. Plass*, 413 S.W.2d 698

(Tex. 1967).[9]  *Cunyus*, 727 S.W.2d at 564.  In *Leithold*, the Supreme Court described the

term "custody" as follows:

> '[c]ustody' of a child connotes the right to establish the child's domicile and
> includes the elements of immediate and direct care and control of the child,
> together with provisions for its needs.

413 S.W.2d at 700.

The definition of "custody" cited in *Cunyus* comports with the term's technical and

common usage.  Although the Texas Family Code does not specifically define the term

"custody," the Family Code does define "legal custody" and "physical custody."  Tex. Family

Code Ann. § 152.102 (11), (14) (Vernon 2002).   "Legal custody" is "managing

conservatorship of a child," and "physical custody" is "the physical care and supervision of

a child."  *Id.*[10]  These definitions are compatible with the rights and duties of parents to

have physical possession of their child, direct their moral and religious training, establish

---

[9]In *Leithold*, the Supreme Court was asked to determine whether the judgment of the trial court modifying an out-of-state divorce decree affected not only visitation rights but also custody of the child.  *Id.* at 700-01.

[10]"Legal custody" is also defined as "the authority to make significant decisions on a child's behalf, including decisions about education, religious training and healthcare." Black's Law Dictionary 413 (8th ed. 2004).  "Physical custody" is defined as "caregiving authority."  *Id.*

18

their residence, and provide care, control, protection, and reasonably discipline their child. *See generally* Tex. Fam. Code Ann. § 151.001 (Vernon 2002).[11]

In determining whether the evidence established that the defendant intended to interfere with the custody of the children, the *Cunyus* Court asked whether the defendant's actions "interfere[d] with the parents' rights to establish the child's domicile, [citation omitted], or intrude[d] upon the parents' exercising their right to care for and control the child." 727 S.W.2d at 564. The Court determined that the parents' ability to control or raise their child was unaffected or diminished where the defendant suggested one child call its parents to ask permission to accept *defendant's offer* to go to the movies, and the defendant ultimately *offered and took the children home*. *Id.* at 564-65. (emphasis added). Clearly, *Cunyus* does not apply here.

Appellants suggest that § 25.06 of the Penal Code, pertaining to the offense of Harboring a Runaway Child, supports their contention that the period of time involved in this case is factually insufficient to support a conviction. That one may defend against a charge of harboring a runaway child if that person notified "a law enforcement agency or a person at the child's home of the presence of the child within 24 hours of discovering that the child was voluntarily absent from home" without parental consent is irrelevant here.[12]

---

[11]Parental rights and duties set forth in the Texas Family Law Code are compatible with the common usage of the term "custody." *See* Merriam-Webster's Collegiate Dictionary 308 (11th ed. 2003) (Custody is defined as "immediate charge and control.").

[12]Tex. Penal Code Ann. § 25.03(c)(2) (Vernon 2003).

The Legislature did not establish such a defense or time limitation in § 25.04(a), and we will not imply one. That the Legislature established such a defense under § 25.06 indicates they are capable of amending § 25.04(a) if they so desire.

Custody of a child is comprised of a bundle of common law and statutory rights and duties belonging to a parent or legal guardian. As such, we find it unnecessary to choose between the definitions set forth above in reaching our decision. Here, the evidence shows Appellants intended to interfere with Matilde's custody of Abigail by actively encouraging Abigail to leave her home and supplying assistance to her in a pre-planned exit. Appellants agreed to provide Abigail with the means and opportunity to run away and picked her up at the Medina home at 2:00 a.m. without informing Matilde or asking her permission. The evidence shows Appellants then knowingly took Abigail into their charge and control and secreted her from Matilde for nineteen hours. Moreover, the evidence also establishes that Appellants' relentless pursuit of their goal of obtaining custody of Abigail interfered with Matilde's custody under any of the above definitions. Accordingly, we find, based upon the record, the State's evidence was factually sufficient to satisfy all elements for proving the offense of enticing a child. Appellants' second issue is overruled.

### III. Third Issue - Character Testimony

Appellants contend the trial court erred by excluding the character evidence testimony of Nicole Gonzales. During the guilt/innocence phase of the trial, Appellants called Gonzales as a witness. Prior to Appellants having the opportunity to ask Gonzales

any questions, the State objected to relevancy of her testimony. In response to the objection, Appellants' counsel stated:

> Your honor, this witness will be testifying basically to the extent that Mr. Little and Mrs. Little have actually helped other young ladies in the past, and; therefore, you know, that's what's going on in this case and not that they had any intent to do anything with Abigail other than to help her.

At that time, the State requested to take the witness on voir dire to establish that she had no personal knowledge as to the relationship between Appellants and Abigail. During the State's voir dire of Gonzales, she testified she knew Appellants but did not know Matilde or Abigail. She further testified that she had never been present when Appellants were in Abigail's company. At that point, the trial court sustained the State's objection without any further testimony from Gonzales.

Because the State failed to favor us with a brief, we are limited in our review of this issue to the arguments raised at trial by the State. Here, the only objection raised by the State was relevance. Because trial courts are in the best position to decide substantive admissibility questions, we must review the trial court's ruling on admissibility under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001). Under this standard, an appellate court should not reverse a trial court whose ruling was within the zone of reasonable disagreement. *State v. Mechler*, 153 S.W.3d 435 (Tex.Crim.App. 2005). Therefore, the question that we must determine is whether the trial

21

court's decision that Gonzales's testimony was not relevant is within the zone of reasonable disagreement.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence.  Tex. R. Evid. 401.  Relevant evidence is presumed admissible.  Tex. R. Evid. 402; *Erazo v. State,* 144 S.W.3d 487, 499 (Tex.Crim.App. 2004).  Evidence that is not relevant is inadmissible.  Tex. R. Evid. 402.  Error may not be predicated upon a ruling which excludes evidence unless a substantial right of a party is affected, and the substance of the evidence was made known to the court by offer, or was apparent from the context in which questions were asked.  Tex. R. Evid. 103(a)(2).  Here, no formal offer of proof in question and answer form was made by Appellants; however, their counsel did make the substance of the proffered evidence known to the court.  Specifically, Appellants' counsel informed the court that the substance of Gonzales's testimony concerned the extent to which Appellants may have helped other young ladies in the past.  Whether Appellants had ever helped other young ladies in the past is not evidence having any tendency to make the existence of any fact that is of consequence to the determination of their guilt or innocence more or less probable than it would have been without the evidence.  Therefore, on its face, the proffered testimony was not relevant.

22

Appellants argue further that their "counseling character" would have been relevant to the issue of their intent to commit the charged offense. Evidence of other acts may be admissible for purposes of proving intent. Tex. R. Evid. 404(b). In this case, the trial court determined that evidence of Appellants' counseling character did not make the existence of an intent to interfere with the lawful custody of Abigail more probable or less probable. We cannot find that decision to be outside the zone of reasonable disagreement. Therefore, we conclude the trial court did not abuse its discretion in excluding Gonzales's testimony. Appellants' third issue is overruled.

## Conclusion

Accordingly, the trial court's judgments are affirmed.

Patrick A. Pirtle<br>
Justice

Publish.