**Reversed, Judgment of Acquittal Rendered, and Opinion Filed August 28, 2020**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-18-00884-CR**

**MICHAEL SHANNON THEDFORD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80655-2018**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Partida-Kipness

On June 21, 2016, Michael Thedford dropped his two oldest children off at daycare and drove home with his six-month-old daughter, Fern, who had been sick with a fever and was staying home that day. Sadly, Michael forgot Fern was still in the vehicle and left her in the back seat. When he arrived home, he went inside and fell asleep. Michael woke up four hours later and found Fern in the vehicle. Tragically, Fern died of hyperthermia. The sole issue before us is the sufficiency of the evidence to support the jury's guilty verdict for criminally negligent homicide. We reverse the conviction and render a judgment of acquittal.

# BACKGROUND

When this tragedy occurred, Jennifer and Michael Thedford were married and had three children together. Jennifer was a veterinarian, and Michael was a high school physics teacher. The Thedfords' oldest child was five years old and had recently finished kindergarten, their second child was three years old, and their youngest child, Fern, was six months old. The two youngest children attended daycare at MudPies and Lullabies, a daycare and preschool near the Thedfords' home, and the oldest child was attending the preschool during summer vacation.

On June 21, 2016, Michael was on summer vacation from his teaching job and was responsible for taking the children to school. Michael's three-year-old daughter woke him up at 7:30 a.m. Michael had the children ready to go to school by 8:15 a.m., put them into the family minivan, and made the short trip to the school. Because Fern had been sick with a fever, he intended to drop the two oldest children at school and bring Fern home with him for the day. The school has two buildings. Fern and her older sister were in the building that housed the infant through three-year-old classes. When he arrived at school, Michael parked the car, walked his older daughter into the school, and took her to her classroom. His son and Fern remained in the minivan. Next, he drove to the other building and walked his son inside. Fern remained in the minivan. While inside, Michael logged into the school's check-in system, checked in the two older children, and clicked on Fern's picture to indicate

she was not being checked in to school that day. Michael then left the building, returned to the minivan, and drove away.

Michael drove straight home after dropping the children off at school, and the drive took only a few minutes. When he arrived home, he exited the minivan, went inside, got in bed, and fell asleep. Michael told investigators that he fell asleep at about 9:00 a.m. and woke up at 1:00 p.m. His wife, Jennifer, called him after he woke up. He was talking with Jennifer and walking to the living room when he saw the minivan out of the corner of his eye through the front door and he realized Fern was not in the house. He panicked and ran outside to the minivan. He found Fern in the minivan still sitting in her car seat. One side of her face was discolored, and she was very hot. Cell phone records show that Jennifer called Michael at 1:25 p.m. Jennifer told a sheriff's office investigator that while she was on the phone with Michael, he screamed and told her that Fern was cold, not breathing, and was dead. Jennifer told Michael to call 9-1-1, which he did within two minutes of getting Jennifer's call. Before calling 9-1-1, however, Michael carried Fern into the house. He placed Fern in the refrigerator with the door open where he could still see her as he called 9-1-1. He removed her from the refrigerator and placed her on the floor when the 9-1-1 dispatcher gave him instructions on how to administer CPR to Fern.

Michael told the 9-1-1 dispatcher that he had woken up from a nap and found his infant daughter dead in her bassinet. He described Fern as "burning hot to the touch" and told the dispatcher Fern had a fever that morning. When he was

–3–

transferred to the American Medical Response (AMR) Dispatcher, Michael also told that dispatcher he had put the baby in the bassinet beside his bed and then took a nap. He told the AMR dispatcher that Fern was hot to the touch, not awake, completely stiff, not breathing, and that he could feel the heat coming off of her. The AMR dispatcher talked Michael through starting CPR, and he repeated the instructions back as he completed mouth to mouth breathing and chest compressions on Fern. The paramedics arrived as Michael was doing chest compressions. Michael also told the paramedics he had fallen asleep, but didn't mean to sleep that long, and that he found the baby in her bassinet next to the bed when he woke up. The following exchange could be heard on the 9-1-1 call:

UNIDENTIFIED VOICE: Those van doors are open.

UNIDENTIFIED VOICE: Huh?

(Unintelligible voices in the background.)

MICHAEL THEDFORD: Oh, no.

UNIDENTIFIED VOICE: Where was this —the bassinet was in there?

THE DEFENDANT: (Inaudible) ~ it's not like I left her in the car, or anything.

UNIDENTIFIED VOICE: Where do you ~ where did — did you open the car door to take her to the hospital?

MICHAEL THEDFORD: What? The car's open?

UNIDENTIFIED VOICE: Yes.

MICHAEL THEDFORD: Yes. I was in this -- yes. When I found her, that's the first thing I did. I already had taken inside. I brought this in to take her to the hospital, but this — (inaudible) —

–4–

(Unintelligible voices in the background.)

UNIDENTIFIED VOICE: Sir, do you have a blanket?

UNIDENTIFIED VOICE: I'll get it.

UNIDENTIFIED VOICE: All right. We'll both move our stuff. We're going together — uh — leave our stuff here — (inaudible) —

(Unintelligible voices in the background.)

MICHAEL THEDFORD: Uh -- it could be, because I didn't take it out.

UNIDENTIFIED VOICE: How did it get out? How did it get out?

(Unintelligible voices in the background.)

MICHAEL THEDFORD: I ~

(End of 911 call.).

Paramedics pronounced Fern dead shortly after arriving on scene and reporting her condition to the department's medical director.

Collin County Sheriff's Office Investigator Danny Stasik arrived on scene at 1:40 p.m. He spoke with Michael inside the house, and Michael admitted he forgot Fern in the minivan when he returned from dropping the other children off at school that morning and he found Fern in the minivan after waking up. Michael said when he returned home that morning, he was feeling "very woozy," wandered into the house, and fell asleep immediately. He thought he would lie down for a few minutes, but ended up sleeping until 1:00 p.m. Michael said he completely forgot about Fern. Michael also told Stasik that when he found Fern, she was stiff and "so hot," and his "panic brain" told him he should try to bring her body temperature down as quickly as possible. So, he put her in the refrigerator as he was dialing 9-1-1, but removed

–5–

her to start following the 9-1-1 dispatcher's instructions. Michael said he was on the phone with Jennifer when he found Fern and removed her from the minivan.

Stasik transported Michael to the sheriff's office for questioning. During that interview, Michael again told Stasik he found Fern in the minivan after he woke up. Michael told investigators he had taken his other two kids to the preschool that morning but not Fern because she had been sick and was going to stay home. Michael explained he took Fern with him in the minivan to drop the other children off at school. He returned home around 9:00 a.m., fell asleep, and woke up around 1:00 p.m. When he awoke, he realized Fern was not in the bassinet by the bed, and he found her in the minivan. He stated he must have forgotten her in the minivan when he returned home because he was very sleepy that morning. He also told investigators he takes several prescription medications to treat his bipolar disorder. The one medication discussed in detail was Seroquel, which Michael described as a sedative and "mood leveler." Michael said his prescribed dose was 600 milligrams and, within forty minutes of taking that dose, he would be out for eight to nine hours. He told investigators he took his prescribed dose of Seroquel at 12:30 a.m., which was later than normal. Michael also explained that he put Fern in the refrigerator as he was calling 9-1-1 because she was so hot and, even though he knew she was dead, he thought there might be some hope to bring her back. Michael told investigators his normal routine is to drop all three kids off at the preschool and then "there's nothing to do" when he returns home on a normal day. He usually checks email and

maybe works on hobbies when he gets home. But that day, he "just stumbled into bed" because he was so sleepy.

## THE TRIAL

The State indicted Michael on one count of manslaughter, one count of tampering with or fabricating physical evidence, and one count of abandoning or endangering a child. The State's witnesses included the dispatcher from the sheriff's office, the preschool director, two paramedics who first arrived on scene, three sheriff's office investigators who dealt with crime scene evidence and witness interviews, the medical examiner, and Stasik. The State also presented video interviews of Jennifer and Michael and a video of Michael doing a walk-through with Stasik showing what happened from the time he returned home that morning to the time paramedics arrived. In addition, the jury heard the 9-1-1 call and saw videos from the school of Michael dropping his son and daughter off that morning. After the State rested, the trial court determined there was insufficient evidence to go to the jury on manslaughter.

Michael did not testify. He did, however, present several witnesses for his defense. Four of those witnesses, the pediatric nurse practitioner who treated Fern for her fever, two teachers from the preschool, and one of Michael's long-time friends, testified that Michael was a loving and attentive father. The teachers also testified they watched the videos of Michael dropping the children off that morning,

did not see anything unusual in the videos, and many parents leave one child in the car while they drop another child off in the other building.

Michael's primary witness was Dr. David Diamond, a professor who lectures undergraduate and graduate students and health professionals on brain and memory function. Dr. Diamond testified he had been studying why parents forget kids in cars for fourteen years to try to understand how this can happen and why it happens so often. Dr. Diamond first explained that this can happen to anyone and it cuts across society:

> It happens to mothers, fathers, grandmothers, grandfathers. It happens to people of all occupations -- blue collar, white collar. It happens to professors, doctors, lawyers, teachers. There appear to be – there's no restriction. Essentially, the only requirement is this can happen to anyone. It's part of being human.

Dr. Diamond then described three areas of the brain that are active when performing a task such as driving. The basal ganglia engage when a person performs a task out of habit or routine, allowing a person to drive a familiar route without having to think about which turn to take. The frontal cortex allows a person to plan for future action. The hippocampus allows people to learn new information and to store memories. These areas can work together, but they also can work against each other. According to Dr. Diamond, the competition between these parts of the brain explains why a parent might forget his child is still in the car.

Dr. Diamond explained there are two types of memory — memories for facts and prospective memory. Prospective memory is planning to do something in the

future and expecting that we will remember to do it at the right time. He testified prospective memory is most vulnerable and can lead to catastrophe. Some benign examples are forgetting to call someone you intended to call or forgetting about an appointment. But other examples can result in tragedies, such as when a surgeon leaves a surgical tool inside the body during surgery, a plane crash results from pilot error, or a parent leaves a child in the car seat, instead of getting the child out of the car upon arrival at their destination.

Dr. Diamond explained there are also competing memory systems. The habit memory system, such as driving home from work each day, competes with the fresh memory system, such as when you tell yourself you need to stop at the store on the way home to pick up medication. The habit memory system is often so powerful that it dominates and suppresses the memory of needing to stop at the store such that you get home without realizing you forgot to go to the store. According to Dr. Diamond, these competing systems are what causes a parent to forget his child in a car. The parent puts the child in a car seat with every intention to retrieve the child when the parent arrives at home, but during the drive, the parent loses awareness of the child in the car and, as a result, leaves the child in the car. He testified that in cases where a parent left a child in the car, every parent interviewed afterward said they had been driving a route they had taken many times and lost awareness that the child was in the car. Dr. Diamond further explained that when you are sleep deprived or sleep impaired, you have impaired memory for new information and, even after a poor

–9–

night's sleep, the likelihood is dramatically increased you will follow a habit or routine. Sleep deprivation does not affect all areas of the brain. It impairs the frontal cortex but does not impair the habit system. And the basal ganglia do not keep track of who is in the car. The basal ganglia only get us from Point A to Point B. They do not keep track of any new information. They only keep track of our habits.

Dr. Diamond theorized that after Michael dropped his older children off at school, two ingrained habits competed with new memory information in Michael's brain the day Fern died. First, Michael spent years driving only two kids to day care each day and, because Fern was only six months old, taking three kids to school was a relatively new habit. Second, it was not a habit to take the older kids to school and then return home with Fern. Rather, the most recent habit for Michael was to drop all three children at school and then return home alone. According to Dr. Diamond, it was that new habit Michael followed on the day of Fern's death; namely, "arrive home, exit the car, go into the house." This habit would not have included "look in the back seat for Fern." Because of the routine, Michael's hippocampus was no longer retaining the awareness of Fern in the car. The routine was reinforced that day because Michael had not brought Fern's diaper bag with him. The diaper bag would normally be in the front seat with Michael if Fern was in the car. But Michael did not bring the bag that morning because Fern was not being left at school. When Michael arrived home, the car appeared empty as usual, so he exited the car and went inside according to his usual routine.

Dr. Diamond believes if Fern had made noise or had been fussy in the back seat, this would not have happened, because the sounds would have triggered the memory the child was in the car. He testified it is important in these cases to know whether the child was quiet or not because a sleeping or quiet child is not giving a cue to the driver of the child's presence. According to Dr. Diamond, Michael was very precise in his answer to Dr. Diamond when asked whether Fern was quiet or asleep during the drive home; Michael was certain she was quiet, but he was not certain that meant she was sleeping. Dr. Diamond also testified Michael was much more likely to follow a habit than new information because he was sleep deprived and tired.

The charges submitted to the jury were criminally negligent homicide, tampering with or fabricating physical evidence, and abandoning or endangering a child. The charge instructed the jury to find Michael guilty of criminally negligent homicide if they found from the evidence beyond a reasonable doubt that Michael, with criminal negligence, caused the death of Fern "by leaving [her] unattended in a motor vehicle without air conditioning or water."

The State's theory of the case was that Michael was criminally negligent because he took Seroquel less than nine hours before he knew he would need to take the children to school, knew the medication knocked him out for eight or nine hours, and had a duty as a parent to recognize taking that medication at that time posed an unreasonable risk he would act in a way that Fern would die. The State urged the

jury to look at everything that happened the day Fern died to find Michael guilty of criminally negligent homicide. During closing argument, the prosecutor pointed to Michael's statements to the 9-1-1 dispatchers and the paramedics that he found Fern dead in the bassinet and to Michael's decision to put Fern in the refrigerator as evidence Michael knew he had acted with criminal negligence.

The prosecutor told the jury that "Criminal negligence has to do with whether or not you should have remembered;" and "A person is criminally negligent if they should be aware of a big, bad, scary risk. . . not being aware of the risk is what constitutes the crime if it is a risk that someone should be aware of." The prosecutor argued that the jury should ask "Is this risk so big and so bad that we, as a society, say, Hey, look, you've got a duty to recognize that risk. And, ladies and gentleman, there is no bigger risk than the loss of a child. This is the tiptop of the priority list. He had every duty in the world to recognize this as a risk as he is a father."

The State argued Michael was guilty of criminally negligent homicide because: (1) he decided to take Seroquel the night before knowing it would knock him out; (2) the next morning, he left Fern in the car twice at school when he took the other children into the school "knowing that he was extraordinarily sleepy and that he might very well forget later on in the day"; (3) "he failed to realize every single reminder that was put in place that could have reminded him of the fact that Fern was in the back of the car"; (4) he failed to look in the rearview mirror or the mirror on the backseat looking into the car seat before exiting the minivan; (5) "he

passed up every single opportunity he had to realize that she was in the back of the car"; (6) "he walked by a sea of reminders" in the house that should have reminded him that Fern was in the car; and (7) he "slept the day away" next to the bassinet "that he was subsequently going to lie about to try to sell this baby's death." The State told the jury if they believed Michael acted with criminal negligence in killing his daughter, then the jury must also find him guilty of abandoning or endangering a child with criminal negligence.

The tampering charge was based on the State's theory that Michael tampered with Fern's body by placing her in the refrigerator and reducing her body temperature. The State argued if Michael knew Fern was dead when he removed her from the minivan, then the jury must find him guilty of tampering with her body because the only reason to put her in the refrigerator was to bring her temperature down enough so that he could "sell" the lie he was telling to 9-1-1 and the paramedics that Fern happened to die from a fever.

The jury asked three questions during deliberations: (1) can criminal negligence occur without intent; (2) could an accident be homicide; and (3) what does "criminal" in "criminal negligence" mean? The trial court referred the jury back to the jury instructions and told the jury "[a]ll the law you need is contained within [your jury instructions]."

The jury unanimously found Michael guilty of criminally negligent homicide and of abandoning or endangering a child with imminent danger of bodily injury.

–13–

The jury unanimously found Michael not guilty of tampering with or fabricating physical evidence. After the jury returned its guilt–innocence verdict, the State elected to go forward on the criminally negligent homicide conviction only. Michael then waived his right to have the jury decide punishment and elected to accept the State's punishment offer of a two-year sentence probated for five years, which the trial court approved. The trial court entered a judgment of conviction for criminally negligent homicide, sentenced Michael to two years' confinement, and suspended that confinement in favor of placing Michael on community supervision for five years. The trial court also entered a judgment of acquittal as to the charge of tampering with or fabricating physical evidence.

Michael appealed. The trial court denied Michael's amended motion for new trial. On appeal, Michael challenges the sufficiency of the evidence to support the jury's finding on criminally negligent homicide.

**STANDARD OF REVIEW**

When reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). We do not resolve conflicts of fact, weigh evidence, or evaluate the credibility of the witnesses as this is the function of the trier of fact. *Williams v. State*, 301 S.W.3d 675, 684

–14–

(Tex. Crim. App. 2009) ("The *Jackson* standard of review gives full play to the jury's responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence."); *Little v. State*, 246 S.W.3d 391, 398 (Tex. App.—Amarillo 2008, no pet.). Instead we determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the adjudication. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992). The factfinder may choose to disbelieve all or any part of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Each fact need not point directly and independently to the guilt of the appellant as long as the cumulative force of all the incriminating circumstances is enough to warrant conviction. *Kennemur v. State*, 280 S.W.3d 305, 313 (Tex. App.—Amarillo 2008, pet. ref'd). Circumstantial evidence is as probative as direct evidence and can be sufficient alone to establish an accused's guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

In making our review, we have an obligation and responsibility "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Ross v. State*, 543 S.W.3d 227, 234 n.14 (Tex. Crim. App. 2018). Under the *Jackson* standard, evidence may be insufficient when the record contains no evidence of an essential element, merely a modicum of evidence

of one element, or if it conclusively establishes reasonable doubt. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013).

## APPLICABLE LAW

A person commits criminally negligent homicide if he causes the death of an individual by "criminal negligence." TEX. PENAL CODE § 19.05(a). Texas defines the mental state for criminal negligence as:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE § 6.03(d).

A legally sufficient showing of criminally negligent homicide requires the State to prove that: (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that the conduct created a substantial and unjustifiable risk of death; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under similar circumstances. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing TEX. PENAL CODE §§ 6.03(d), 19.05(a)). The circumstances must be viewed from the standpoint of the defendant at the time the allegedly negligent act occurred. *Id.* at 623.

Criminal negligence is not simply the criminalization of ordinary civil negligence. *Id.* The "carelessness required for criminal negligence is significantly higher than that for civil negligence" and the conduct "involves a greater risk of harm to others, without any compensating social utility" than does conduct that constitutes ordinary civil negligence. *Id.* (quoting *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012)). For conduct to constitute criminal negligence, it must be "egregious" and there must be some "serious blameworthiness" attached to the conduct. *Harber v. State*, 594 S.W.3d 438, 448 (Tex. App.—San Antonio 2019, pet. ref'd) (quoting *Queeman*, 520 S.W.3d at 629, 630). The risk created by the conduct must be "substantial and unjustifiable," and we determine whether the conduct involves such an extreme degree of risk by examining the conduct itself, not the resultant harm. *Queeman*, 520 S.W.3d at 623. Finally, the defendant's "failure to perceive [the risk] must be a 'gross deviation' from reasonable care as judged by general societal standards by ordinary people." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193).

To determine whether the State presented sufficient evidence such that a reasonable jury could find the "serious blameworthiness" that elevates tortious conduct to a gross deviation from the ordinary standard of care, we must look at the antecedent circumstances that culminated in Michael leaving the child in the car. *See Ives v. State*, No. 08-16-00026-CR, 2017 WL 3887444, at *8 (Tex. App.—El Paso Sept. 6, 2017, pet. ref'd) (not designated for publication); *see also Tello v. State*, 180

S.W.3d 150, 158 (Tex. Crim. App. 2005). As our sister court noted in *Ives*, the negligence standard that a parent may breach in these cases is failing to look out for the safety of his child, and that standard can be breached "in any number of ways, some minor, and some gross, either of which might lead to an accidental death." *Ives*, 2017 WL 3887444, at *8. The *Ives* court used a child's death on a playground swing set following a parent's failure to watch their child as an example. If the parent momentarily failed to watch his child but the child died on the swing set, the parent would be merely negligent. *Id.* But if the parent failed to know where his child was for a number of days, and the child died unsupervised on the same swing set, the parent's conduct would likely be found sufficiently blameworthy to merit a criminal sanction. *Id.* This is because "the circumstances surrounding both situations will define" the parent's culpability. *Id.* "Otherwise, the focus becomes the death of a child, which *post hac* might always appear to arise from a gross departure of the duty of care." *Id.* In other words, "it is not leaving the child in the car that defines the blameworthiness, but how that event came to pass." *Id.*

For example, in *Ives*, the appellant was convicted of criminally negligent homicide after forgetting to drop her five-month-old daughter off at daycare and tragically leaving the infant in her vehicle outside of her workplace. *Ives*, 2017 WL 3887444, at *1. Ives found her daughter in the vehicle at the end of the workday, and the infant had died of heat exposure. *Id.* The evidence at trial showed that Ives recently changed medication to treat her uncontrolled high blood pressure, slept

poorly the night before her daughter's death, and woke up feeling groggy, but still drove her children to daycare that morning. *Id.* at *2. She also changed her normal routine when she decided to go to McDonald's after dropping her four-year-old daughter at daycare but before taking the infant to her daycare location. *Id.* Since the infant's birth, Ives had also become forgetful, irritable, emotional, tired, and stressed. *Id.* at *1. The *Ives* court noted that these were the antecedent circumstances that culminated in Ives leaving the child in the car, and conceded that, "[a]t least in hindsight, each of these might be viewed as a departure from the standard of care for a parent." *Id.* at *8. The court concluded, however, that no rational jury could conclude that those circumstances were "*gross* departures from conduct expected by general societal expectations." *Id.* The court noted that any other conclusion would have Draconian results not supported by the facts of that case:

> Otherwise, we would effectively require any parent who was fatigued, under stress, or had experienced some forgetfulness to defer any parenting duty that might conceivably place their child at risk. Such a verdict would effectively require any person whose high blood pressure medicine was being adjusted to refrain from transporting or caring for children. Nor is it rationale [sic] to conclude that a parent, who alters their route while driving children back and forth, has committed morally blameworthy conduct.

*Id.* The *Ives* court noted that the only example of Ives's forgetfulness prior to her daughter's death was that Ives forgot to pack diapers in her diaper bag several weeks prior. *Id.* The court concluded that example was "hardly the sort of warning sign that would cause Appellant to turn over her parenting duties to another." *Id*.

# ANALYSIS

We conclude the reasoning of *Ives* is equally applicable here. The antecedent circumstances that culminated in Michael leaving the child in the minivan include: (1) taking his normal, prescribed dose of Seroquel later than usual the night before Fern's death, (2) taking his children to daycare less than nine hours after taking the Seroquel, (3) driving home with Fern when he felt very sleepy, and (4) departing from his usual routine by dropping only two of the children off at daycare and failing to put the diaper bag in the minivan for the trip to school. No rational jury could conclude that these circumstances constitute gross departures from conduct expected by general societal expectations.

We determine whether the conduct involves "an extreme degree of risk" by looking at the conduct itself, not the resultant harm. *Queeman*, 520 S.W.3d at 623. Michael's conduct here does not involve such risk. Many medications cause drowsiness. Michael knew his prescribed dose of medication knocks him out within forty minutes of taking it and allows him to sleep for eight to nine hours, which is likely why he takes it at night. Although he admittedly took the medication at 12:30 a.m., which was later than usual, the evidence showed that his daughter woke him up seven hours later and he was able to get the kids ready for school and drop them off without raising any concerns with the preschool staff within eight hours of taking the medication. The record does not support a finding that Michael had any reason to suspect that taking the medication late and driving the children to daycare anyway

would create a substantial and unjustifiable risk of death to Fern, or that his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under similar circumstances. The same is true for Michael's decision to make the three-minute drive home with Fern when he felt very sleepy. As for the departures from his usual routine, although not bringing the diaper bag and returning home with Fern instead of returning home alone contributed to Michael forgetting Fern in the vehicle, they do not constitute deviations from any standard of care owed by Michael as a parent. The same is true for the State's unsubstantiated arguments to the jury that Michael failed to "realize every single reminder that was put in place" to remind him Fern was in the car and passed up "every single opportunity" to realize she was in the car. The State presented no evidence of what those reminders and opportunities were or how missing them constitute deviations from any standard of care owed by Michael as a parent or rises to the level of serious blameworthiness necessary to establish criminal negligence. In examining the conduct itself and not the resultant harm, we conclude the evidence is legally insufficient to support the jury's finding Michael acted with criminal negligence when he left the child in the minivan.

The State maintains *Ives* does not apply because Michael was taking multiple medications that negatively impacted his ability to care for Fern. The State further argues that *Ives* is distinguishable because the blood pressure medication at issue in *Ives* "was not one of the four key facts the court held insufficient," and Michael was

far more sleep deprived than Ives because he took Seroquel the night before, which knocked him out and made him groggy the next day. These are distinctions without meaning because Michael took his normal prescribed dose of Seroquel and, although he was very tired the morning in question, there is no evidence that Michael was functioning abnormally or presented any warning signs to make Michael turn over his parenting duties that morning. The teacher who interacted with Michael at drop off that morning testified she had no concerns with his ability to function normally, and the witnesses who knew Michael before this tragedy testified there was nothing unusual about his actions on the videos of him dropping the children off at the preschool. At most, these antecedent circumstances show a parent who took a medication later than normal, knew the effects, and then drove his children to school more than eight hours later when he was still tired. This case presents no legally significant differences from a situation where a parent drives his child to day care after being up all night with a teething or colicky infant or after taking cold medicine. Sleep deprivation goes hand in hand with parenting young children. We conclude it is unrealistic and irrational to conclude a parent commits criminally blameworthy conduct when he fails to defer any parenting duty that might conceivably place his child at risk whenever the parent is tired, fatigued, or taking prescription medications, either on time or off-schedule. *See Ives,* 2017 WL 3887444, at \*8; *see also Queeman*, 520 S.W.3d at 631; *see also Harber*, 594 S.W.3d at 453.

The State also relies on *Vreeland v. State*, to support its contention that the conviction should be affirmed. *See Vreeland v. State*, No. 13-04-00368-CR, 2006 WL 3028065 (Tex. App.—Corpus Christi–Edinburg, Oct. 26, 2006, no pet.) (mem. op., not designated for publication). In *Vreeland*, a mother was found guilty of endangering a child after she left her two-month-old daughter in her car seat for seven hours and the infant died. *Id.* at *2. There, the defendant loaded her infant into a car seat to run an errand in the early morning hours. *Id.* She returned to her house around 6:50 a.m., and went inside until she left the house around lunchtime and ran several more errands. *Id.* Around 2:00 p.m., she discovered her then-deceased infant still strapped in the car seat. *Id.* The court affirmed the conviction, noting that she had entered and left the small vehicle nine times without noticing the child. *Id.* at *5 The defendant claimed she thought she had dropped the child off at daycare on her first errand of the day. *Id.* at *2. Her routine, however, was to drop the child's car seat at the day care with the child, and that day the car seat was "immediately obvious" and "clearly" visible from outside of the vehicle. *Id.* at *5. Calling the circumstances suspicious, the court found a rational jury could have concluded that the mother recklessly or with criminal negligence placed the infant in imminent danger of death or bodily injury. *Id.*

We find *Vreeland* distinguishable because Vreeland's failure to realize her child was in the car despite multiple opportunities to discover either the child or the clearly visible car seat when she entered and exited the vehicle during the day

–23–

provided legally sufficient proof of culpability. No such evidence is present here. On the contrary, Michael lost awareness that Fern was in the vehicle with him on the drive home and, regrettably, forgot about her when he entered the house and fell asleep. Unlike the parent in *Vreeland*, the first time Michael saw the vehicle after waking up, he realized Fern's absence in the house, realized what he had done, and immediately ran to the vehicle to remove Fern. *Vreeland* is distinguishable and inapplicable here.

The State also contends *Ives* is distinguishable because Michael "told a series of lies and made other efforts to conceal the true manner of [Fern's] death." We disagree. "[I]t is not leaving the child in the car that defines the blameworthiness, but how that event came to pass." *Ives*, 2017 WL 3887444, at *8. Likewise, it is not Michael's initial reaction upon realizing he had forgotten his daughter and finding her deceased in the minivan or his false statements to the 9-1-1 dispatchers and first responders that provide legally sufficient support for a criminal negligence finding. Michael's reactions and statements after finding Fern are irrelevant to the question of how "the event" of Michael leaving Fern in the minivan "came to pass" because those reactions and statements occurred hours after the event itself, and the State presented no evidence the reactions or statements were connected in any way to the event. Michael's initial failure to admit he found Fern in the minivan could support a finding he had a guilty conscience after discovering he had accidently left his daughter in the car and she had died, a finding he was ashamed or scared to admit

the truth, or even a finding that he displayed an atypical reaction to trauma. Michael's statements do not, however, support the finding he acted with criminal negligence when he left his child in the car. The relevant facts and circumstances to determine Michael's criminal liability are those circumstances leading to Michael leaving Fern in the minivan. *See Queeman*, 520 S.W.3d at 623 (the focus is on the defendant's "failure to perceive the risk" "at the time that the allegedly negligent act occurred"). His actions thereafter are irrelevant to the question of whether he was criminally negligent at the time he left her in the vehicle. *See Ives*, 2017 WL 3887444, at *8.

## CONCLUSION

The tragedy of this case is undeniable. A child's life is over too soon and a family has been impacted in unimaginable ways. Tragic consequences such as these, under this set of facts and circumstances, however, do not elevate ordinary negligence to criminal negligence. Because the evidence does not rise to the level of serious blameworthiness necessary to establish criminal negligence, we sustain Michael's sole issue. Accordingly, we reverse the judgment of conviction and render

judgment of acquittal. Having to live with this for the rest of his life is the real punishment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2
180884F.U05

Evans, J., dissenting



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL SHANNON
THEDFORD, Appellant

No. 05-18-00884-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 296-80655-
2018.
Opinion delivered by Justice Partida-
Kipness. Justices Nowell and Evans
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**REVERSED** and the appellant is hereby **ACQUITTED**.


Judgment entered this 28th day of August, 2020.